UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHAEL RICHARDSON,

    Plaintiff,

                                    CASE NO.:  5:12-CV-00201-RS-CJK

v.

BAY DISTRICT SCHOOLS,

    Defendant.
_____/

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Bay District Schools ("BDS" or "Defendant"), pursuant to N.D. Fla. Loc. R. 56.1, hereby files this Statement of Undisputed Material Facts in support of Defendant's Motion for Summary Judgment and state as follows:

1. Plaintiff, Michael Richardson ("Richardson"), works in the Bay District Schools Maintenance Department.  He has been employed with BDS since 2002.  (Pl. Dep., p. 28:12-14).  Since that time, Richardson has worked as a Material Controller in the Defendant's Maintenance Department.  (Pl. Dep., p. 7:6-7).  Richardson's direct supervisor at all times pertinent hereto was Kenny Hoffman ("Hoffman").  (Pl. Dep., p. 24:24).  The Supervisor of the Maintenance Department, who was Hoffman's superior, was James "Jimmy" Thompson ("Thompson") during the relevant time period.  (Pl. Dep., p. 27:8-9).

1

2. Sometime after October 2006, Thompson was promoted to Maintenance Supervisor. (Pl. Dep., p. 35:20, 35:23-24). When Thompson took over the Maintenance Department, he had around ninety employees; since then the budget had been cut by $1 million, and the department had lost twenty employees. (Thompson Dep., p. 14:8-10). Every time a staff member from the department resigned, or retired, or otherwise was otherwise terminated, the district would not fill the position. (Thompson Dep., p. 14:12-14, 67:1-3).

3. Richardson has known Thompson since 1998. They met through the church they both attended and were already longtime friends when Richardson came to work at BDS in 2002. (Pl. Dep., p. 28:12-14). Richardson considered Thompson a good friend, who he would socialize with often, many times including both men's wives. (Pl. Dep., p. 29-30). In fact, Richardson states that most people described him as Thompson's "right hand man." (Pl. Dep., p. 90:3-6). Thompson also considered Richardson a good friend for many years. (Thompson Dep., p. 12:19-22, 14:15-16, 15:8, 23:21-24). It was commonplace for Thompson to treat Richardson to lunch; Richardson and Thompson were typically alone during these social lunch breaks. (Pl. Dep., p. 46-47).

4. At some point in their friendship, things started to go downhill. Richardson reports that he knew that Thompson would often flirt with, or make comments about, young waitresses at a restaurant the two men often visited on their lunch hours. (Pl. Dep., p. 44). For some time, Richardson often heard from Thompson that he liked women of Asian descent and that Thompson had a desire to

2

have sexual relations with women of Asian descent, including those who were waitresses at the restaurant they frequented for lunch. (Pl. Dep., p. 44-48).

    5.    The first instance Richardson remembers of Thompson making an inappropriate comment to or concerning Richardson's wife, Hermana Richardson ("Ana"), was in September or October of 2009. (Pl. Dep., p. 37:17-18). In October of 2009, Ana reported to Richardson that she had received a phone call from Thompson at home. (Pl. Dep., p. 37:17-18). She told him that Thompson had called and told her that she had "perky boobs" and was a very pretty woman. (Pl. Dep., p. 37:13-14). Ana also told Richardson two weeks later that during that same phone call Thompson offered Ana money to have sex with him. (Pl. Dep., p. 37:21-24).

    6.    After learning this from his wife, Richardson states that he went straight to Thompson to say he knew all about Thompson's phone call to Ana and expressed that he did not want that to happen again. (Pl. Dep., p. 49:7-11, 49:17-18). Following this conversation, Richardson reports that Thompson's unwelcome behavior calmed down for a period of time and that all was quiet. (Pl. Dep., p. 49-50). During that time Thompson refrained from making sexual comments altogether. (Pl. Dep., p. 50:6-7). Richardson and Thompson also stopped going out to lunch together during that time. (Pl. Dep., p. 51:25-52:5).

    7.    In the early months of 2010, Richardson and Thompson appeared to be patching things up and they began to go to lunch together again occasionally. (Pl. Dep., p. 52:4-5). Richardson reports that soon after that, approximately between January and June of 2010, Thompson started offering Richardson money if

3

Richardson would help facilitate Thompson's desire to sleep with one of the Asian waitresses he had previously make comments about. (Pl. Dep., p. 55:1-9). Richardson refused. (Pl. Dep., p. 55:7-9). At that time, Thompson was not directing any of his comments at Ana. (Pl. Dep., p. 56:12-13). Although Thompson had a habit of making sexual comments, which were often vulgar and offensive to Richardson, he did not do so daily during this timeframe. (Pl. Dep., p. 63:24).

      8.      Thompson never discussed the idea of exchanging money for sex in front of anyone other than Richardson himself. (Pl. Dep., p. 64:17-21). Richardson states that when having these types of conversations at work, Thompson would say "shh-shh" and try to keep the conversation quiet so others would not hear. (Pl. Dep., p. 135:12-15).

      9.      Richardson states that Ana wanted nothing to do with Thompson after the phone call she received in October of 2009. (Pl. Dep., p. 76:20-77:6). However, in November of 2010, Richardson talked Ana into attending the Maintenance Department's Thanksgiving dinner. (Pl. Dep., p. 65:24-25). Following the dinner, Richardson testified that Thompson, who was also at the dinner, followed Richardson into the parking lot and said "forget about other Asians, I want Ana." (Pl. Dep., p. 66:4-5). After this encounter, Thompson was allegedly making constant comments and daily phone calls to Richardson, all focused on Thompson's sexual desires and his hopes that Richardson would "get" him "an Asian." (Pl. Dep., p. 78, 80, 82).

4

10. Thompson never propositioned Richardson with requests or suggestions that Richardson and Thompson engage in any sexual activities with one another. (Pl. Dep., p. 74:15; Hoffman Dep., p. 25:20-24; Thompson Dep., p. 71:3-11). Richardson explicitly stated in deposition that "he's never tried to have sex with me." (Pl. Dep., p. 74). However, after repeatedly being turned down, Thompson did start to suggest that Richardson could join in when Thompson got to have sex with Ana or an Asian woman; Thompson added that he would talk a girl into having sex with Richardson also. (Pl. Dep., p. 96:21-25). All apparently in an attempt to entice Richardson by adding things that benefited Richardson. (Pl. Dep., p. 96:22-25).

11. At some point between the middle of 2010 and February of 2011, Thompson made a second phone call to Ana. (Pl. Dep., p. 80:21-23). Richardson again confronted Thompson personally upon learning of the phone call from Ana. (Pl. Dep., p. 81:1-4). Richardson reports that the end of 2010 and first couple of months of 2011 are when Thompson's behavior reached its lowest point, when Thompson was bothering Richardson day and night with requests and conversations regarding sex. (Pl. Dep., p. 78, 80).

12. In the first week of March 2011, Richardson carried a recording device to get he and Thompson's conversation on tape showing that Thompson was soliciting Richardson's assistance in getting Ana to have sex with Thompson in exchange for money. (Pl. Dep., p. 102-104).

13. In the early months of 2010, Richardson states that he let Hoffman know about Thompson's phone call to Ana in October of 2009. (Pl. Dep., p. 59). As

5

stated in Richardson's March 22, 2011 e-mail to the Superintendent: "I had told Kenny my supervisor about this remark to Anna 2 days before breast cancer about the perky boobs. At that point I never said anything else until March 8 and I told him everything." (Pl. Dep., Ex. 4). Richardson stated that his March 22, 2011 e-mail was "very accurate," even though his memory in 2013 was less clear with regard to what happened when. (Pl. Dep., p. 98:14-15, 98:21). Similarly, Hoffman only recalls being told something about Thompson wanting to touch Ana's breasts at some point prior to learning everything in March of 2011. (Hoffman Dep., p. 25:16-19).

14. At the time of their first conversation in 2010, both Hoffman and Richardson did not think Thompson's conduct amounted to sexual harassment. (Pl. Dep., p. 69:11-12). Richardson stated "[Hoffman] did not feel like it was sexual harassment and I didn't either." (Pl. Dep., p. 69:11-12). Hoffman, knowing the long-term relationship between Richardson and Thompson, thought the situation was just an issue of "friends being friends." (Hoffman Dep., p. 6:10-15).

15. Although Hoffman was not scared of Thompson, he did not consider himself a friend of Thompson's, and stated that he "just worked for him." (Hoffman Dep., p. 15:3-4, 19:19-23). Hoffman never witnessed anything that gave him the impression that Thompson ever hit on women at work and Thompson had never had sexual conversations with Hoffman. (Hoffman Dep., p. 18:23, 19:12). Hoffman also did not believe that Thompson was a vindictive boss who ever disciplined employees without justification. (Hoffman Dep., p. 20:9-17). To the HR Director's

knowledge, there has never been a complaint of sexual harassment filed against Thompson other than Richardson's. (Dr. Richardson Aff., ¶8; Michalik Aff., ¶3).

16.  Later on in 2010, Richardson also confided in a co-worker, Tammy Miller ("Miller"), who he describes as his "best friend." (Pl. Dep., p. 68:8-18, 70:7-8). However, Richardson never reported Thompson's behavior to anyone else at BDS. (Pl. Dep., p. 68:19-22).

17.  On March 8, 2011, Richardson told Hoffman everything that had transpired between he and Thompson in the foregoing months, and played one of his audio recordings for Hoffman. (Pl. Dep., p. 101; Hoffman Dep., p. 16-17, 21:12-14). Hoffman's immediate reaction was that Richardson needed to report Thompson's conduct to the district office. (Pl. Dep., p. 108:16-17; Hoffman Dep., p. 16-17). However, Richardson said he did not want to report anything further up the chain yet because Richardson was getting ready to leave for his vacation and did not want to deal with this before he left for Hawaii. (Pl. Dep., p. 108). As stated by Richardson:

```
15      Q    Did Kenny tell you to report it?
16      A    Yeah, Kenny told me, he said, we're going to have
17   to report it is what he said.  And I said, well, Kenny, at
18   that point, I says, Kenny, just don't tell anybody for two
19   weeks, I said, I promise the week we come back, I'll do it.
20      Q    Okay, so you asked Kenny not to report it?
21      A    I asked him that, just that last two weeks not to
22   report it.  That was when he said we've got to report it,
23   and I said, well, if you would, don't say nothing for two
24   weeks.  I said let us get back from this trip.
```

(Pl. Dep., p. 108). Per Richardson's request, Hoffman did not tell anyone about what Richardson had told him until after Richardson had returned from his trip. (Hoffman Dep., p. 17:16-20).

18.  Upon returning from his vacation, Richardson sent an e-mail to the Bill Husfelt, the Superintendent of Schools (the "Superintendent"), explaining the whole situation to the Superintendent. (Pl. Dep., p. 87-88; Husfelt Aff., ¶5). The e-mail, which was addressed to the Superintendent and copied to the Human Resources Director at the time, was sent on March 22, 2011. (Pl. Dep., p. 87-88; Pl. Dep., Ex. 4). By that time, eighteen months had elapsed since Richardson states he saw a change in Thompson's personality, which eventually deteriorated into the events of early 2011 and Thompson's arrest. (Pl. Dep., p. 90:19-24).

19.  As soon as the Superintendent and the Director of Human Resources, Dr. Tommye Lou Richardson (the "HR Director"), were made aware of Richardson's situation, both immediately responded; the Superintendent via e-mail, and the HR Director via phone. (Pl. Dep., p. 112:25-113:3; Husfelt Aff., ¶5; Dr. Richardson Aff., ¶2). The HR Director conducted an investigation into Richardson's e-mailed complaint. (Dr. Richardson, Aff., ¶5). That same day, BDS alerted the Sheriff's Department of Thompson's illegal activity. (Husfelt Aff., ¶6; Dr. Richardson Aff., ¶5). Within a few hours of Richardson's phone call with the HR Director, investigators from the Sheriff's Department were at Richardson's home to conduct an investigation. (Pl. Dep., p. 113:19-22).

20. The very next day, Richardson and the Sheriff's Department coordinated a sting operation, during which an officer was waiting for Thompson at Richardson's house when Thompson showed up with the intent to have sex with Ana Richardson in exchange for money. (Pl. Dep., p. 176:22-177:7; Husfelt Aff., ¶7). Thompson was arrested on the spot and charged with solicitation of prostitution. (Thompson Dep., p. 8:18-23, 19:13; Husfelt Aff., ¶7). He subsequently admitted to authorities that he went to the house with the intent to have sex with Ana Richardson. (Thompson Dep., p. 12:12-14). BDS gave Thompson a choice between resignation and facing termination proceedings, and Thompson resigned after nineteen years as a BDS employee. (Thompson Dep., p. 8:8-17; Husfelt Aff., ¶8; Dr. Richardson Aff., ¶5).

21. During the duration of the events described herein, Kenny Hoffman was employed as the Logistics Supervisor in the Maintenance Department. (Hoffman Dep., p. 7:21). Richardson stated that within months of Thompson becoming the Supervisor of Maintenance, Thompson began promising Richardson that he would be promoted to the position held by Hoffman when Hoffman retired. (Pl. Dep., p. 33-34). Richardson testified at deposition that Thompson had repeatedly promised him that he would be given Hoffman's job when Hoffman retired. (Pl. Dep., p. 33-34, 77-78). Toward the end of their friendship, Thompson allegedly made comments indicating that Richardson's chances of getting Hoffman's job depended on Richardson helping Thompson sleep with either "an Asian" in general, or Ana, specifically. (Pl. Dep., p. 77-78). Admittedly, Thompson had no

9

authority to promise positions to anyone. (Thompson Dep., p. 15:9-17). However, Richardson states that he believes BDS eliminated the position out of some sort of retaliatory scheme against Richardson for reporting Thompson's conduct. (Pl. Dep., p. 111:2-13).

22. Following Richardson's complaint to the Superintendent and Thompson's arrest, BDS demoted Hoffman because he failed to report Richardson's complaints immediately. (Pl. Dep., p. 114:18; Hoffman Dep., p. 8:13; Hussfelt Aff., ¶9; Dr. Richardson Aff., ¶ 6).

23. Hoffman's Logistics Supervisor position was not filled when he was demoted but was eventually eliminated when those duties were merged with another supervisor position. (Pl. Dep., p. 26-27). In fact, Richardson himself made a suggestion to the Superintendent of Schools that the position was unnecessary and its elimination would be an excellent way for the district to trim the budget. In Richardson's e-mail to the Superintendent on March 27, 2011, he stated as follows:

> I can tell you now how to save about $120K a year. Kenny Hoffman's position does not need to be filled. The Supervisor of Maintenance could easily do it because it is mostly office people except for the painters. You have a carpenter supervisor and a locksmith supervisor. . . . Those jobs could easily be merged into one supervisor. Just letting you know.

(Pl. Dep., p. 124; Pl. Dep., Ex. 5).

24. To this day, Richardson remains in the same position with the same salary, benefits, and seniority as he had before, during, and after all incidents of alleged harassment and his reporting of same. (Pl. Dep., p. 139-142; Dr. Richardson

10

Aff., ¶7). Due to global changes throughout Bay District Schools, all BDS employees have experienced changes in their compensation, work load, etc. (Pl. Dep., p. 139-142). However, Richardson's contractual rights have not changed in any way that is unique to Richardson or Richardson's position. (Pl. Dep., p. 114:21-23, 139-42, 146:11-12, 147:3-19). Although Richardson states that his work load has increased since he first started his job, he also states that this occurred prior to his complaint and was associated with the aforementioned budget-induced global changes. (Pl. Dep., p. 144-45). Richardson at deposition confirmed that he in fact has not lost his job, he still works the same hours as he always has, and he still occupies the same office he always has. (Pl. Dep., p. 139-42). Sharon Michalik, who took over as HR Director in January of 2012, has no knowledge of Richardson ever applying for any other position with BDS since January1, 2010. (Michalik Aff., ¶ 2, 3).

25.     BDS maintains an anti-harassment policy with mechanisms for reporting harassment that allow a victim to do so anonymously online or to someone who is above the victim's supervisor. (Dr. Richardson Aff., ¶3, Ex. 1, 2). Defendant has properly promulgated such policy. (Dr. Richardson Aff., ¶4). In fact, weeks prior to Richardson's complaint to the Superintendent, BDS sent the policy to all employees via e-mail as a refresher for all. (Husfelt Aff., ¶ 3, Ex. 1). In addition to being periodically distributed via e-mail, BDS maintained copies of harassment policies, which are posted throughout the District's worksites, including in the Maintenance Department. (Dr. Richardson Aff., ¶4). Attached to the affidavit of the HR Director is a picture of the poster that was and still is in place in the District's

Maintenance Department.  (Dr. Richardson Aff., Ex. 3).  In addition, BDS could and did receive anonymous complaints of harassment through its website.  (Dr. Richardson Aff., ¶3, Ex. 1, 2).

      26.    Throughout the months when Richardson was experiencing unwelcome contact from Thompson, he did not look for options regarding how to report harassment in the workplace.  (Pl. Dep., p. 153:23-154:5).  He did not go on the internet to find Defendant's web-based anonymous reporting mechanism.  (Pl. Dep., p. 155:3-19, 154:6-12; Pl. Dep., Ex. 9).  He did not contact anyone in the personnel department.  (Pl. Dep., p. 154:15-25).

      Dated this 8th day of March, 2013.

                        Harrison Sale McCloy

                        */s/*Robert C Jackson
                        ROBERT C. JACKSON
                        Florida Bar No. 0149519
                        HEATHER K. HUDSON
                        Florida Bar No. 0091178
                        HARRISON SALE MCCLOY
                        P.O. Drawer 1579
                        Panama City, Florida 32402
                        Telephone: (850 )769-3434
                        Fax: (850) 769-6121

                        ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on March, 8, 2013, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of Court through ECF and that ECF will send a notice of the electronic filing to James Garrity at Marie A. Mattox, P.A., 310 East Bradford Road, Tallahassee, Florida 32303.

                 */s/* Robert C. Jackson
                 ROBERT C. JACKSON