UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHAEL RICHARDSON,

        Plaintiff,

vs.                              Case No.  5:12cv00201-RS/CJK

BAY DISTRICT SCHOOLS,

        Defendant.
_____

DEPOSITION OF:        James Thompson

AT THE INSTANCE OF:   The Plaintiff

DATE:                 February 18, 2013

TIME:                 9:00 a.m. – 10:30 a.m.

PLACE:                Coastal Reporting
                      929 Jenks Avenue
                      Panama City, Florida 32401

REPORTED BY:          Kim L. Clark-Waterhouse

**Coastal Reporting**
Office: 929 Jenks Avenue – Panama City, Florida 32401
Mail: P.O. Box 1945 – Lynn Haven, Florida 32444
Telephone: (850)271-3107 • Facsimile: (850)722-9200
Website:  *CoastalReportingPC.com*

## APPEARANCES

For the Plaintiff:        James Garrity, Esq.
                          MARIE A. MATTOX, P.A.
                          310 East Bradford Road
                          Tallahassee, Florida 32303


For the Defendant:        Robert C. Jackson, Esq.
                          HARRISON SALE McCLOY
                          304 Magnolia Avenue
                          Panama City, Florida 32401


Also Present:             Gerald Virga, Esq.

                  * * * * * * * *

## INDEX

                                          **Page No.**

TESTIMONY OF JAMES THOMPSON
  Direct Examination by Mr. Garrity ..........    3
  Cross-Examination by Mr. Jackson ...........   71
CERTIFICATE OF OATH .........................   73
REPORTER'S CERTIFICATE ......................   74

1    THEREUPON,

2                    **JAMES THOMPSON,**

3    having been duly sworn to tell the truth, the whole truth

4    and nothing but the truth, responded and testified as

5    follows:

6         THE WITNESS:  Yes.

7                 **DIRECT EXAMINATION**

8    BY MR. GARRITY:

9         Q.    Good morning.

10        A.    Hey.

11        Q.    Would you tell us your name, address and phone

12   number for the court reporter?

13        A.    James David Thompson.  3107 Lawton Court, Panama

14   City.

15        Q.    All right.  Mr. Thompson, have you ever had your

16   deposition taken before?

17        A.    No.

18        Q.    Have you ever testified in a courtroom?

19        A.    No.

20        Q.    Have you ever been in any setting like this

21   where you had to be sworn in and then answer questions

22   under oath?

23        A.    No, I'm not aware of any.

24        Q.    Okay.  So let me give you some basic rules about

25   today's process.  I think we have you for an hour, or

1     Q.    So are you currently employed anywhere?

2     A.    I am self-employed.

3     Q.    Okay.  You used to work at the Bay County School

4  Board?

5     A.    Correct.

6     Q.    Okay.  Could you tell us from what month and

7  year to what month and year you worked there?

8     A.    For the Bay District Schools, I think

9  October 1992 up until March of I guess it would be 2011

10  or something.

11     Q.    How did your employment come to an end?

12     A.    I retired.

13     Q.    Did you negotiate the deal to be able to retire

14  as opposed to being terminated?

15     A.    I didn't negotiate.  I was offered you can

16  retire or we can go before the school board and stuff

17  like that and I chose to retire.

18     Q.    Okay.  Now, have you ever been arrested?

19     A.    No, other than in this incident with Mike.

20     Q.    So I'm including anything in your entire life.

21     A.    That would have been the only time.

22     Q.    One time?

23     A.    Yes.

24     Q.    And did you plead guilty?

25     A.    It was dismissed.  The charges were dismissed.

1    that point?

2        A.   I wasn't arrested until after the tape.

3        Q.   Okay.  After the conversation?

4        A.   Yes.

5        Q.   Was everything that you told the officer during

6    that interview true?

7        A.   The transcript that I read -- now, I never heard

8    the tape.

9        Q.   I understand.

10       A.   The transcript was not accurate.

11       Q.   In what way was it not accurate?

12       A.   Well, because I said to him, he said did you go

13   over there for the purpose of having sex with Anna and,

14   hey, I was guilty.  I admit it.  But what I told him was

15   that Mike asked me and encouraged me to go over there.

16   He left that out of the transcript.  And that Mike has

17   done that multiple times over a three or four year

18   period.  And I admit I was wrong.  I did it.  But I

19   succumb to that and I take responsibility for that.  But

20   you can be sure Mike was my friend of 12 or 13 years and

21   I would never have done anything to hurt him or his wife,

22   Anna.  And I admit my moral failings for that, but he

23   encouraged me.  When the tape was not recording me, and I

24   went in there and said, Mike, you are my friend, Anna is

25   my friend, I don't feel good about this.  No, go, go, go

1    to that?

2        Q.    Sure.

3        A.    Did I want to promote Mike?  100 percent yes.

4        Q.    Into what position?

5        A.    Into a painting logistics supervisor position.

6    He would have been good at it, and I would have loved to

7    have promoted him.  And that's why we're here today is

8    because when I took over maintenance I had 90 employees.

9    Within three years my budget had been cut $1 million and

10   I had lost 20 employees.  In the paint division where he,

11   this guy Kenny Hoffman, that was going to retire, if I

12   remember right, eight painters.  Well, every time one

13   would retire or resign, the district would not fill the

14   position.  So it went from eight, I believe it was eight

15   painters down to three.  Now, I like Mike.  He was my

16   friend, as good a friend as anyone there.  I would have

17   loved to have him in that position.  He would, in my

18   opinion, done an excellent job.  But I went to Mike about

19   a year or year and a half before this happened.  And I

20   said, Mike, I'm thinking about not filling that position

21   because we're all taxpayers.  You don't pay a man $50,000

22   to supervise three people.  If it had been eight

23   painters, I could have justified doing that position.

24   But I said I could take those three painters and I could

25   put them in other shops and then save the district

1  $50,000 a year.  And I intended to ask Bill Husfelt to

2  eliminate that logistics supervisor position that I would

3  have loved to give Mike and create an electrical

4  position.  I had four electricians.  I had 4 million

5  square feet of property to maintain.  And I was open and

6  honest with Mike.  But could he have done that job and

7  would he have been good at it?  Absolutely.  And I

8  considered him my friend.

9      Q.   So did you ever promise him the logistics

10  supervisor position?

11      A.   I never promised.  You can't promise anyone --

12  no.  The answer is no.

13      Q.   Okay.

14      A.   The reason of that is even if I wanted to give

15  it to him, the superintendent, Bill Husfelt, has the

16  final say or whether it's him or Mr. McCallister.  But I

17  would have loved to give him the position.

18      Q.   Did you ever tell Mr. Richardson you were going

19  to recommend him for the logistics supervisor position?

20      A.   If it had been filled, yes.

21      Q.   So you did tell him that?

22      A.   I would have loved to give it to him, yes.

23      Q.   You told him that?

24      A.   I'm trying to think.  What are you saying now?

25      Q.   Just asking if you ever told him verbally that

1      Q.   Did you ever tell Mr. Richardson a story about

2   you and your brother having sex with a woman that you

3   claimed to have picked up many years ago and offered her

4   money and then when she was having sex the money was

5   taken out of the cigarette pack and switched to a dollar

6   bill?

7      A.   No.

8      Q.   That never happened?

9      A.   No, it never did.

10     Q.   Did you ever tell either Mr. Richardson, or any

11  other employee that, and I may mispronounce the name

12  here, about Kim Huguenard coming to you and hugging you

13  and that you would tell folks that, or Mr. Richardson,

14  that you would pull her toward you and rub up against

15  her?

16     A.   No.  And that's -- can I add to that?

17     Q.   Sure.

18     A.   Kim is a young lady that worked there

19  temporarily for a year.  She's a very nice lady.  And I

20  really, I really feel bad that Mike would do that to her.

21  She has a nervous type personality and stuff and she is

22  innocent as she can be.  And why he would do that is, he

23  must -- all I can say is he's got to be desperate.

24     Q.   Did you talk to Mr. Richardson about tag teaming

25  female employees at Chow Time?

1    it on my desk.  Why would he do that if I'm harassing

2    her?  And I have that in my possession with his

3    handwriting.  How does he explain that?

4        Q.   You have what in your possession?

5        A.   I'm certain I got it at the house.

6        Q.   What is it?

7        A.   Mike wrote Anna's e-mail one day down.  And he

8    has told me that Kenny, how would I know this without him

9    telling me, that Kenny e-mails her back and forth.  And

10   then one day he lays her e-mail address.  He was trying

11   to set me up and I did not even realize it.  Well, I

12   never e-mailed her, because if I did, you would have it.

13   I never took the bait.

14       Q.   Did you ever show cash or display cash to

15   Mr. Richardson and tell him that it could be his for an

16   hour with his wife?

17       A.   Yes.  Can I add to that?

18       Q.   Certainly.

19       A.   Yes.  About a year and a half, or about a year

20   he was trying to set me up.  And one day we are doing our

21   budget.  Keep in mind Mike and I have been friends for

22   10, 12, 13 years.  He's been in my home.  We've had

23   steaks, hamburgers, fish.  He's been on my boat.  We've

24   been out to dinner.  We're friends, okay?  All right.  I

25   go into his office one day and I said, Mike, do you need

1    every time I lost on employee the District would not fill

2    it and it was getting to the point I'd rather have a

3    sorry employee than have no one at all.  And I'm just

4    being honest about it.

5        Q.   Did you ever have any fights or arguments with

6    Mr. Hoffman?

7        A.   No.  But I did bring him into my office.  Mike

8    is the one that called me.  He had screamed at two of the

9    women there, Tammy and Kim.  Mike called me, he said you

10   need to get back over here.  I said what's going on?

11   Kenny Hoffman is out here screaming at Tammy and Kim.

12   When I got back to my office, I brought Kenny into my

13   office.  I brought Kim and I brought Tammy into my office

14   and we all sat down there.  And I said, hey, I've got

15   accusations that you are screaming at these women, let me

16   tell you here is how it works.  You don't do that.  I

17   said if you have an issue with one of these women, you

18   bring them into your office and you talk to them one on

19   one, you treat them with respect.  And if you don't, it's

20   not going to be good.  Let's put things in perspective.

21   When you are an administrator, of the six administrator,

22   at the end of the year the director of maintenance can

23   non-renew them and they don't have to give a reason.  So

24   Kenny knew that if I wanted to get rid of him all I had

25   to do is put non-renewed, and you don't put the reason.

1        **<u>CROSS-EXAMINATION</u>**

2    BY MR. JACKSON:

3        Q.   I just have a couple of questions for you,

4    Mr. Thompson, and they're pretty short.  Did you want to

5    have sex with Mr. Mike Richardson?

6        A.   Him?

7        Q.   Yes.

8        A.   No.

9        Q.   Did you make any sexual advances towards

10   Mr. Mike Richardson at any time?

11       A.   Never.

12       Q.   Did you ever promise Mr. Richardson a job if he

13   had sex with you?

14       A.   No.

15       Q.   Did you make any kind of employment decision

16   based on Mr. Richardson's sex?

17       A.   No.

18            MR. JACKSON:  That's a all I have.

19            MR. GARRITY:  You are all set.  Thank you.

20       Appreciate it.

21       A.   I will say this.  I've got to say it.  You know,

22   I take responsibility for my mistakes.  And I really did

23   love Mike and Anna as friends and Tammy.  And I forgive

24   him for what he's done.  And I just, as a Christian, I

25   have to forgive.

1  STATE OF FLORIDA
   COUNTY OF BAY
2

3                    **CERTIFICATE OF OATH**

4

5          I, the undersigned authority, certify that James

6  Thompson personally appeared before me on February 18,

7  2013 and was duly sworn.

8          WITNESS MY HAND AND SEAL this _____ day of

9  _____ 2013.

10

11

12                         _____
                           Kim L. Clark-Waterhouse
13                         Notary Public

14  My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF FLORIDA
      COUNTY OF BAY
 2

 3

 4

 5                    REPORTER'S CERTIFICATE

 6

 7         I, KIM L. CLARK-WATERHOUSE, Court Reporter, DO

 8    HEREBY CERTIFY that I was authorized to, and did

 9    stenographically report the deposition of James Thompson

10    on February 18, 2013; that a review of the transcript was

11    not requested; and that the transcript is a true and

12    complete record of my stenographic notes.

13         I FURTHER CERTIFY that I am not a relative,

14    employee, or attorney, or counsel of the parties, nor am I

15    a relative or employee of any of the parties' attorney or

16    counsel connected with the action, nor am I financially

17    interested in the action.

18         DATED this _____day of _____ 2013.

19

20

21                    _____
                      Kim L. Clark-Waterhouse
22

23

24

25
```