UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


MICHAEL RICHARDSON,

       Plaintiff,

vs.                  Case No.  5:12cv00201–RS/CJK

BAY DISTRICT SCHOOLS,

       Defendant.
_____

DEPOSITION OF:      Kenny Hoffman

AT THE INSTANCE OF:  The Plaintiff

DATE:            February 18, 2013

TIME:            10:45 a.m. – 11:20 a.m.

PLACE:           Bay District Schools
                     1311 Balboa Avenue
                     Panama City, Florida 32401

REPORTED BY:        Kim L. Clark–Waterhouse

**Coastal Reporting**
Office: 929 Jenks Avenue – Panama City, Florida 32401
Mail: P.O. Box 1945 – Lynn Haven, Florida 32444
Telephone: (850)271–3107 • Facsimile: (850)722–9200
Website:  *CoastalReportingPC.com*

**APPEARANCES**

For the Plaintiff:      James Garrity, Esq.
                        MARIE A. MATTOX, P.A.
                        310 East Bradford Road
                        Tallahassee, Florida 32303


For the Defendant:      Robert C. Jackson, Esq.
                        HARRISON SALE McCLOY
                        304 Magnolia Avenue
                        Panama City, Florida 32401


* * * * * * * *

**INDEX**

**Page No.**

TESTIMONY OF KENNY HOFFMAN
   Direct Examination by Mr. Garrity .......... 3
   Cross-Examination by Mr. Jackson ........... 24
   Redirect Examination by Mr. Garrity ........ 26
CERTIFICATE OF OATH ......................... 28
REPORTER'S CERTIFICATE ...................... 29

1   THEREUPON,

2                          **KENNY HOFFMAN**,

3   having been duly sworn to tell the truth, the whole truth

4   and nothing but the truth, responded and testified as

5   follows:

6              THE WITNESS:  I do.

7                       **DIRECT EXAMINATION**

8   BY MR. GARRITY:

9        Q.   For the record, would you just tell us your

10  name, address and phone number?

11       A.   Kenneth Hoffman, 5409 Frank Huff Road, Panama

12  City, Florida, 32401 or 4.  819-6192.

13       Q.   All right.  Have you ever had your deposition

14  taken before?

15       A.   No.

16       Q.   Have you ever testified in a courtroom?

17       A.   No.

18       Q.   Let me give you a couple of quick ground rules

19  for this process and then we will try to get you in and

20  out of here as quick as we can.  First, keep in mind that

21  this is not a practice run.  It's not casual conversation

22  even though we are not in a courtroom.  It is sworn

23  testimony just as if you were sitting on the stand in

24  front of a judge and jury; do you understand that?

25       A.   Yeah.

1    basically have sex with her.

2        Q.   Did you tell Mr. Richardson that you were

3    concerned -- that he should be concerned about losing his

4    job and you might lose yours, too, if it was reported?

5        A.   I don't remember saying that.

6        Q.   Did you ever report Mr. Richardson's comments to

7    HR or to someone above you?

8        A.   No.

9        Q.   How come?

10       A.   At the time, Jimmy and him -- I mean, they were

11   tight friends.  I thought they were anyways.  And when I

12   first heard this, I thought it was just, you know,

13   friends being friends, because I have heard people

14   rephrase, make statements something like that other times

15   in my past about people's wives and stuff, so.  And

16   another thing, we were never trained in this situation.

17   They are now, but we were never trained, period.

18       Q.   You didn't have any training from the School

19   Board on how to deal with complaints of sexual

20   harassment?

21       A.   No.

22       Q.   So you yourself didn't know exactly what to do

23   with it; is that a fair summary?

24       A.   Are we referring to when I first heard the tape?

25       Q.   Or when Mr. Richardson --

1  A. When I first heard about it, no, no.

2  Q. Okay.  So let me go back just to make sure we

3 are clear.  When Mr. Richardson first came to you and

4 started reporting Mr. Thompson's comments about wanting

5 to have sex with his wife, do I understand you to be

6 saying that at that time you were not trained on how to

7 deal with those kinds of complaints?

8  A. That's correct.

9  Q. Did you get trained at some later point?

10  A. No.

11  Q. Or not while you were employed there?

12  A. Not while I was a supervisor.

13  Q. But you believe that now the School Board is

14 taking care of that, maybe going back and now training

15 people to deal with it?

16  A. Yeah.  Basically, they came out that Friday when

17 they demoted me and sent an e-mail out referring to the

18 situation, which was after they had already cut me back.

19  Q. You were demoted from what position to what

20 position?

21  A. I was logistics supervisor to painter.

22  Q. Pay cut?

23  A. Big time.

24  Q. Did you retire from the School Board?

25  A. Yes.

1    Q.   As a painter?

2    A.   Well, when I got demoted I was already in the

3    drop, so that did not affect my drop money.

4    Q.   Oh, I see, I see.  Did you finish the drop

5    period?

6    A.   Yes.

7    Q.   Is that five years with the School Board?

8    A.   Yes.

9    Q.   Did anyone tell you why you were demoted?  Other

10   than the fact that you were being demoted, did anyone sit

11   down with you?

12   A.   Basically, I was being demoted -- two things I

13   think.  One is because I didn't report it.  And another

14   thing, it was one of their buddies being put down.

15   Q.   Is that Mr. Thompson?

16   A.   Mr. Thompson.

17   Q.   Was Mr. Thompson close to either Haley or

18   Husfelt?

19   A.   Well, Jimmy worked on their bill.  I don't know

20   exactly how close they were.

21   Q.   What do you mean when you say it was one of

22   their buddies being put down?

23   A.   I know that they liked Jimmy.  But when it comes

24   to buddy-buddy, I don't know how close they were in that.

25   But I know they were friends, yes.

1    bite you if you were kind of putting it in front of him

2    like that?

3        A.    No.  I don't think I felt that way.  I wasn't

4    scared of Jimmy.

5        Q.    Well, maybe not scared yourself, but concerned

6    about how it might impact your own position.

7        A.    No.  Because I had heard -- now, whether this

8    was true or not, but I did hear that he offered my job to

9    him for sex.  I did hear that.

10       Q.    Where did you hear that from?

11       A.    I can't remember.  It was either from him or it

12   was from Tammy, one of those two.

13       Q.    That Mr. Thompson had offered the logistics --

14       A.    He thought about giving my job to him to have

15   sex with his wife.

16       Q.    When would you have heard that?

17       A.    Just basically probably around the same time all

18   this was going on, in that area.

19       Q.    While you were still employed there?

20       A.    Yes.  Oh, yes.

21       Q.    Because there has been testimony in this case on

22   exactly that point.  I just wanted to make sure you

23   hadn't -- this is not something you heard for the first

24   time, like in the last week or so?

25       A.    No, no.  It was while I was working in the

1   school system.

2       Q.   Did that come up during your meeting in

3   Husfelt's office?

4       A.   I do not believe so.

5       Q.   Do you recall the month or the year that

6   Mr. Richardson first began confiding in you that Thompson

7   was making advances toward Mr. Richardson's wife?

8       A.   No, I can't really remember what month.  The

9   only month I really remembered is I think it was March,

10  when Spring Break was.  The week before all this took

11  place.

12      Q.   March of 2011?  Is that around the time that

13  Mr. Thompson was --

14      A.   It's the time when he was going to Hawaii, yeah.

15      Q.   -- arrested?

16      A.   Yeah, at that time, yeah.

17      Q.   What do you remember from that time?

18      A.   I remember Spring Break was coming up the

19  following week.  Mike and his wife were going to Hawaii

20  Saturday morning.  Mike came -- if I remember right, it

21  was Monday morning, and he brought all this stuff up.  He

22  was tired of it.  He had a recording of Jimmy.  He played

23  the recording to me.  He did not play the whole thing,

24  because I didn't want to hear the whole thing because it

25  was making me sick.  I told him I didn't want to hear

1    anymore.  I said we need to report this.  And he asked me

2    not to because he thought this could all jeopardize his

3    trip to Hawaii, and they had been planning this for a

4    long time.  I said all right.  But when you get back we

5    got to report this.  And he reported it first by e-mail I

6    believe.

7         Q.   To Superintendent Husfelt?

8         A.   Yes.

9         Q.   Do you recall anything in particular you heard

10   on the tape?

11        A.   Just about wanting to have sex and stuff.

12        Q.   Now, so did you join Mr. Richardson at any point

13   in any conversations with supervisors about

14   Mr. Thompson's conduct?

15        A.   No.  I didn't tell anybody about this tape.

16        Q.   Okay.  The two of you agreed that they would

17   wait until he got back from the trip and then report it,

18   and then what you next learned was that Mr. Richardson

19   had written the superintendent?

20        A.   Correct.

21        Q.   Did anybody approach you at that point, from the

22   superintendent's office or from Ms. Richardson's office?

23        A.   No.  The first time I heard them call about me

24   was the day -- it might have been -- if I remember right,

25   Jimmy was arrested on a Wednesday if I remember right.  I

1   think the superintendent's office contacted me Thursday

2   morning to see if I was going to be there all day.  And

3   that is when they had me later on come out to

4   Mr. Husfelt's office.

5        Q.   I see.  Arrest on Wednesday.  You are in

6   Husfelt's office on Thursday and then demoted Friday?

7        A.   Yeah.

8        Q.   Did anyone ever ask you to put your story and

9   what you knew in writing?

10       A.   No.

11       Q.   Like Ms. Richardson call you and say, hey, look,

12  Kenny, just send us an e-mail about what you know,

13  nothing like that?

14       A.   No.

15       Q.   Were you surprised that Mr. Thompson had been

16  arrested?

17       A.   Was I surprised?

18       Q.   Yeah.

19       A.   I heard he was going to be arrested.

20       Q.   Had you ever had any other women, female

21  employees at the School Board, say something to you that

22  indicated that Thompson was hitting on them?

23       A.   I don't think so.

24       Q.   I have heard a name of Terese Osbolt.  Did she

25  ever say anything about him making advances toward her?

1      A.    She may have, but I don't remember.

2      Q.    Tammy Miller?

3      A.    No, I don't think so.

4      Q.    Do you know who Kim Huguenard is?

5      A.    Yes.

6      Q.    Did she ever make any comments about

7  Mr. Thompson's behavior toward her?

8      A.    I don't believe she ever came to me about it.

9      Q.    Did Mr. Thompson ever tell you about sexual

10 encounters he had either with his wife or with other

11 women?

12     A.    No.

13     Q.    Did he ever talk to you about his interest in

14 Asian woman?

15     A.    I don't believe he ever talked to me about it.

16 I heard him talking to Mike about it.  I don't think he

17 ever talked to me.

18     Q.    How was your working relationship with Thompson?

19     A.    It was all right.  I mean, I wasn't buddies with

20 him or anything like that.  I just worked for him.

21     Q.    Did the two of you socialize outside the

22 workplace?

23     A.    No.

24     Q.    Did he ever tell you any stores about his past

25 of any kind, or you just didn't have that kind of working

1   relationship with him?

2       A.   Just when he would go hunting or something like

3   that, or fishing, stuff like that.

4       Q.   Was there ever anything inappropriate that you

5   saw him do?  And by that I mean taking money from the

6   school system or taking property or equipment or anything

7   like that?

8       A.   No, I never seen him take anything.

9       Q.   Did he ever say anything to you in terms of him

10  taking action against another employee that you thought

11  was vindictive or unjustified where it seemed like he was

12  punishing an employee for doing something?

13      A.   No, I can't really think of anybody right

14  offhand, unless you got something that can refresh my

15  memory.  But I can't think of anybody.  And some of the

16  people I thought should have got on wasn't gotten on, but

17  I can't think of anybody.

18      Q.   How long have you worked for the school system?

19      A.   I was there 35 years.

20      Q.   Did you ever have to deal with a complaint of

21  sexual harassment before?

22      A.   No.

23      Q.   Discrimination of any kind?

24      A.   No.

25      Q.   Was it Mr. Husfelt that explained why you were

1    being demoted?

2        A.    He did most of the talking, so it probably was.

3        Q.    Was it him that explained that you should have

4    reported what Mr. Richardson was telling you to -- is it

5    Tommy Lou Richardson?

6        A.    Yeah, that's who it was.  The HR or whatever her

7    title was, personnel, yes.

8        Q.    Did you know who Ms. Richardson was before you

9    were called into Mr. Husfelt's office?

10       A.    Yes.

11       Q.    You knew she was in HR?

12       A.    Yeah.  I explained to them why I didn't come to

13   them.  You know, because he was getting ready to go on a

14   trip, you know, basically that.

15       Q.    Okay.  Give me just one minute.  I might be

16   close to done.  So previously you held the position of

17   logistics supervisor?

18       A.    Yes.

19       Q.    Was Mr. Thompson your immediate supervisor?

20       A.    Yes.

21       Q.    Is it Lee Haley or John Haley was Mr. Thompson's

22   supervisor?

23       A.    Yes.

24       Q.    Who replaced you; do you know?

25       A.    Nobody.  They just moved Carl.  They did away

1    something.

2         Q.    That was before --

3         A.    But basically --

4         Q.    -- that was before the March of 2011 incident?

5         A.    Yeah, it was in that general area.

6         Q.    Okay.  And you just thought that was a personal

7    matter?

8         A.    I just thought at the time -- when I first heard

9    anything about this, I thought it was a bunch of BS

10   personally.  Because as close as friends as they were,

11   going out to eat together and going over each other's

12   homes and stuff, it was just hard for me to picture that.

13        Q.    Sure.

14        A.    It's still really hard.  If I had never heard

15   this tape, it probably would be real hard for me.

16        Q.    So other than the March 2011 report he made to

17   you and then this comment about touching breasts, that's

18   the only thing you can recall?

19        A.    Yeah.

20        Q.    Okay.  Did Mr. Richardson ever report to you

21   that Jimmy Thompson wanted to have sex with him?

22        A.    That Jimmy wanted to have sex with him?

23        Q.    With Mike.

24        A.    Heck no.

25        Q.    Okay.  So all the information you got about this

1    STATE OF FLORIDA
     COUNTY OF BAY
2

3                    **CERTIFICATE OF OATH**

4

5         I, the undersigned authority, certify that Kenny

6    Hoffman personally appeared before me on February 18,

7    2013, and was duly sworn.

8         WITNESS MY HAND AND SEAL this ____ day of

9    _____ 2013.

10

11

12                        _____
                          Kim L. Clark-Waterhouse
13                        Notary Public

14   My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF FLORIDA
     COUNTY OF BAY
 2

 3

 4

 5                    REPORTER'S CERTIFICATE

 6

 7        I, KIM L. CLARK-WATERHOUSE, Court Reporter, DO

 8   HEREBY CERTIFY that I was authorized to, and did

 9   stenographically report the deposition of Kenny Hoffman on

10   February 18, 2013; that a review of the transcript was not

11   requested; and that the transcript is a true and complete

12   record of my stenographic notes.

13        I FURTHER CERTIFY that I am not a relative,

14   employee, or attorney, or counsel of the parties, nor am I

15   a relative or employee of any of the parties' attorney or

16   counsel connected with the action, nor am I financially

17   interested in the action.

18        DATED this _____day of _____ 2013.

19

20
                      _____
21                    Kim L. Clark-Waterhouse

22

23

24

25
```